IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

AMY BROWN, individually and as
Administratrix of the Estate of
JAMES BRADY LEONARD, deceased,

         Plaintiff,

v.                                  CIVIL ACTION NO.  3:18-1496

Mason County COMMISSION;
GALLIA COUNTY BOARD OF COMMISSIONERS;
POINT PLEASANT VOLUNTEER FIRE DEPARTMENT
ADAM BRYANT, individually and in his official capacity;
NANETTE ELLIOTT;
LISA TURNER; and
JOHN and JANE DOE or DOES,

         Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendants' motions for summary judgment (ECF No. 151,

153). For reasons stated below, the motions are **GRANTED, in part, and DENIED, in part**.

**I. BACKGROUND**

This case arises out of a tragic set of facts. On December 7, 2016, James Brady Leonard

was a passenger in a vehicle participating in a drag race along a stretch of road running parallel

to the Kanawha River in Mason County, West Virginia. At some point during the race, the driver

lost control of the vehicle and struck a telephone pole. The collision sent the car flying off the

road and down a steep embankment, eventually landing in the river below. The force of the

impact ejected Leonard from the car and launched him into the river. A friend, Jeffrey Woodall,

pulled Leonard to shore. According to Woodall, Leonard was alive and conscious at this point,

even telling Woodall that he was cold. Though Woodall attempted to carry Leonard back up to the road, the embankment was too steep and slippery for Woodall to make the trip with him. Instead, Woodall left Leonard on the riverbank with another friend, James Stover, and headed up the hill to find something to warm his friend. Upon reaching the top of the hill, Woodall spoke to David McCoy, a witness to the accident and a retired Mason County deputy, who said that he called 911. The parties agree that this initial 911 call occurred at 12:58:51, as indicated by Mason County's computer aided dispatch ("CAD") report. Hearing that McCoy had already called 911, Woodall decided to alert Leonard's mother, Plaintiff Amy Brown.

The timeline becomes blurrier at this point. After McCoy called 911, the operator dispatched Point Pleasant Volunteer Fire Department ("PPVFD"), the Mason County Sheriff's Department, and emergency medical services from Mason and Gallia counties. The first to arrive to the scene from the sheriff's department was Deputy Clifford Varian. According to Varian, he immediately spoke to McCoy, who told him that there was one "DOA" or "dead on arrival." Varian saw Defendant Adam Bryant arrive on the scene one to three minutes after him.

Around the same time as Varian's arrival, Volunteer Fireman Jim Blake and Chief Fireman Jeremy Bryant separately reached the scene. Blake stated that he immediately observed the severed power pole, live power lines, and transformers on the ground. After assessing these hazards, he headed down the embankment toward Leonard, who was still by the river's edge. Having been an EMT in the past, Blake checked for Leonard's pulse and breath. Observing none, Blake checked Leonard's pupils and determined that there was no movement or reaction. Blake signaled to the other PPVFD firemen at the top of the hill that Leonard was deceased. After the incident, Stover would testify that he held Leonard for several minutes before observing him take his last breath as Blake climbed down the hill.

At the top of the hill, Plaintiff Amy Brown reached the scene. The parties sharply dispute the exact time of her arrival, but it is undisputed that she arrived after the firetruck but before the Gallia County ambulance. Defendants argue that she must have arrived after 13:15:29, the time that Mason County's CAD report recorded the firetruck's arrival. Plaintiff, on the other hand, asserts that this CAD report is inaccurate and points to Gallia County's CAD report, which states that the Gallia County ambulance arrived around 13:11. A Gallia County employee on that ambulance stated that she saw the firetruck when the ambulance reached the scene. Plaintiff reasons that this testimony demonstrates that both she and the firetruck arrived earlier than 13:11.

Setting aside the conflicting CAD reports, Plaintiff argues that she remembers arriving sometime between 13:08 and 13:09 in her car. As a skilled flight nurse, Plaintiff Brown states that she was ready and equipped to render aid to her son. After walking past several bystanders and seeing the car in the river, Brown attempted to reach her son but encountered Defendant Adam Bryant, who held out his arms and physically stopped her from going down the hill. Another bystander, Isaiah Burgess, testified that he heard Bryant threaten to arrest Brown, though she states that she did not hear that threat. As an emergency flight nurse, it is undisputed that she is a health care professional qualified to give first aid under challenging circumstances. It is also undisputed that Defendant Bryant knew that she was a flight nurse at that time. After this interaction, Brown states that walked away from Bryant and attempted to go down the hill another way but that she was stopped by PPVFD Chief Jeremy Bryant.

Sometime later, Gallia County's ambulance reached the scene. Gallia County EMS responders conducted a vital check of Leonard, which lasted approximately ten minutes. They determined that Leonard was already deceased and that no resuscitative efforts were warranted.

First responders then loaded Leonard into a stokes basket and brought him up the hill. After transporting the body to a mortuary, James A. Kaplan, M.D., Deputy Chief Medical Examiner, completed a Report of Death Investigation. Kaplan found that Leonard died as a result of "[e]xsanguination due to right axillary contents laceration and abdominal internal injury." Report of Death Investigation, ECF No. 153-11.

About two years later, Plaintiff filed a five-count Complaint in this Court against several municipal and individual defendants. Since then, the Court has dismissed several claims, and four defendants have settled. The remaining defendants, Adam Bryant and Mason County Commission, now move for summary judgment.

## II. STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

(1) Qualified Immunity

Before the Court considers whether summary judgment is appropriate based on the merits of Plaintiff's claims, it must determine whether Bryant is entitled to qualified immunity. In general, qualified immunity shields government officials performing discretionary functions "from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, "when a government official . . . act[s] totally beyond the scope of his authority, he receive[s] no immunity at common law and is entitled to none under § 1983." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997). A defendant "bears the initial burden of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties." *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (internal quotations omitted).

Plaintiff's claims against Bryant are premised on his alleged use of physical restraint against Brown and his threat to arrest her. The Court denied Bryant's previous attempt to invoke qualified immunity and held that Plaintiff sufficiently alleged that these actions were beyond the scope of Bryant's duties as a process server. Plaintiff has since substantiated those allegations.

According to Bryant's deposition transcript, he was working as a process server with the Mason County Sheriff's Department when he heard the radio dispatch call. Bryant then drove a Mason County Sheriff's Department vehicle from the department to the scene of the accident "to see if [he] could help the deputy with anything he needed to [sic] help with." Adam Bryant Dep.

12:9-13. Bryant wore a Mason County Sheriff's Department process server uniform and badgem as well as a duty belt with a firearm, two additional ammunition magazines, handcuffs, and OC pepper spray. *Id*. at 51:15-16, 52:11-15. Burgess testified that he heard Bryant threaten to arrest Brown, though Brown did not recall hearing this threat at her deposition. When asked what he was "supposed to be doing at that time," Bryant responded, "Serving papers." *Id*. at 11:7-9.

> West Virginia law defines the scope of a process server's authority as follows:

> > The sheriff of any county may employ, by and with the consent of the county commission, one or more persons whose sole duties shall be the service of civil process and the service of subpoenas and subpoenas duces tecum. Any such person shall not be considered a deputy or deputy sheriff . . . .

W. Va. Code § 50-1-14. Given that responding to emergency calls, physically restraining individuals, and threatening to arrest bystanders falls well beyond the scope of this statute, the Court must conclude that Bryant is not entitled to qualified immunity.

Bryant argues that he should not be stripped of qualified immunity because he was acting within the scope of his authority as a captain of the Point Pleasant Volunteer Fire Department. It is uncontested that Bryant is a volunteer fireman for the PPVFD and has more than 25 years of experience in that role. Bryant maintains that his experience, training, and role as a volunteer fireman necessarily granted him the authority to control the crowd that day. He also points to West Virginia Code § 29-3A-1, which authorizes certain firefighters to "order any person or persons to leave any building or place in the vicinity of such scene for the purpose of protecting such persons from injury[.]" Finally, Bryant relies on the testimony of Chief of PPVFD, Jeremy Bryant, who stated that if Adam Bryant were there in his role as firefighter, "he would have been in his right and correct to stop a bystander from entering the scene . . . . " Jeremy Bryant Dep. 16:23-24.

Bryant raises an issue that, as best this Court can tell, has not been addressed in this circuit: whether an official acting under the color of state law pursuant to one role can rely on authority pursuant to a second role, despite being off-duty in that second role, for the purposes of qualified immunity. Although there are several cases in which district courts have held that qualified immunity may apply to an official who acts under color of state law while off duty, those cases determined that the law enforcement officers "reverted to their status as on-duty sheriff's deputies" when performing "quintessential law enforcement acts." *Est. of Saylor v. Regal Cinemas, Inc.*, 54 F. Supp. 3d 409, 422 (D. Md. 2014); *see also Drewitt v. Pratt*, 999 F.2d 774 (4th Cir. 1993). The parties here dispute the nature of Bryant's actions.

Nevertheless, the Court need not resolve that question today because it is sufficiently clear that Bryant did not intend to exercise his authority as a volunteer fireman. As indicated above, he responded to the scene to assist the *deputy*, and one witness heard him threaten to make an arrest. Consistent with that understanding, the Chief Jeremy Bryant unequivocally denied that Bryant was acting within his capacity as a fireman: "Adam was there as a process server for the Mason County Sheriff's Department. His actions in this occasion were for the Mason County Sheriff's Department not for the Point Pleasant Fire Department." Jeremy Bryant Dep. 23:12-15. Therefore, the Court concludes that Bryant cannot rely on his role as a volunteer fireman for the purposes of qualified immunity.

Bryant's final attempt to salvage his immunity rests on Sheriff Greg Powers' statement that he expressly authorized him to assist deputies at emergency scenes based on his experience with PPVFD. According to Bryant, W. Va. Code § 7-7-7 generally authorizes sheriffs to employ individuals to assist them with the discharge of their duties.

Although Bryant is correct that § 7-7-7 affords sheriffs broad authority, the Court cannot conclude that Sheriff Powers properly exercised his authority under that statute because there is no evidence that he "obtained the advice and consent of the county commission to such appointment or employment." *See* W. Va. Code § 7-7-7 (a). Moreover, even if Powers had obtained the county commission's consent in assigning more responsibility to Bryant, it is unclear whether a process server can accept such an assignment without violating § 50-1-14, which states that a process server's "*sole* duties shall be the service of civil process and the service of subpoenas and subpoenas duces tecum." *Id*. at § 50-1-14(b) (emphasis added). It is axiomatic that "a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled." *UMWA by Trumka v. Kingdon*, 325 S.E.2d 120, 120 (W. Va. 1984). Thus, the Court again rejects this argument and declines to grant qualified immunity to Bryant.[1]

(2) Count I: Substantive Due Process

The "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). It is true that, in general, the Due Process Clause "does not require the State to provide its citizens with particular protective services." *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 196–97 (1989). However, "when the State by the affirmative exercise of its power so restrains an individual's

---

[1] The Court notes its agreement with Bryant that Fourth Circuit case law would not have given him sufficient notice that his actions were clearly unconstitutional. In particular, *Fijalkowski v. Wheeler*, 801 F. App'x 906 (4th Cir.), *cert. denied*, 141 S. Ct. 261 (2020), demonstrates that—had Bryant been acting within the scope of his authority—he would be entitled to qualified immunity because he rationally believed that restraining Brown was justified by the hazardous conditions and that other responders trained in first aid were either on the scene or en route to the scene. The Court also agrees with Bryant that *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), is distinguishable because in that case, the first responders had no rational reason to prevent qualified bystanders from attempting a rescue. Nevertheless, the fact that Bryant was acting beyond the scope of his role as a process server is determinative.

liberty that it renders him unable to care for himself . . . it transgresses the substantive limits on state action set by . . . the Due Process Clause." *Id.* at 200. Of course, the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Cnty. of Sacramento*, 523 U.S. at 848. Instead, a "plaintiff must demonstrate some egregious official conduct which constitutes an abuse of power that shocks the conscience." *See Tigrett v. Rector & Visitors of Univ. of Va.*, 137 F. Supp. 2d 670, 678 (W.D. Va. 2001) (quoting *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998)) (internal quotations omitted); *see also Waybright v. Frederick Cnty., Md.*, 528 F.3d 199, 205 (4th Cir. 2008) ("[T]he Supreme Court has . . . marked out . . . conduct wrong enough to register on a due process scale as conduct that shocks the conscience, and nothing less.").

Identical to its federal counterpart, the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." W. Va. Const. art. III, § 10. The "republican form of government which exists under the West Virginia Constitution, by its nature encompasses a concept of substantive due process." *Cooper v. Gwinn*, 298 S.E.2d 781, 787 (W. Va. 1981). Unless barred by immunity, a private cause of action exists where a party denies a litigant "rights that are protected by the Due Process Clause embodied within . . . the West Virginia Constitution." *Hutchison v. City of Huntington*, 479 S.E.2d 649, 654 (W. Va. 1996). "In deciding whether a party deprived someone of their property or liberty interest without due process of law under the West Virginia Constitution, the West Virginia Supreme Court looks to, and follows federal case law and precedent." *Smith v. Teach*, No. 3:07-CV-49, 2008 WL 11451886, at *11 (N.D.W. Va. Nov. 13, 2008).

   a.   Adam Bryant

Plaintiff argues that Bryant violated her due process rights by restraining her and preventing her from rendering aid to her son. Bryant's defense is twofold. First, Bryant argues that he cannot be liable under the Due Process Clause because Brown did not hear him make a threat to arrest her. The Court must reject this argument, as it ignores Burgess' testimony that he heard Bryant threaten Brown. Even if the Court were to ignore this testimony, however, a reasonable jury could conclude that his physical restraint constituted seizure by a law enforcement official in violation of Brown's substantive due process rights. Therefore, the Court rejects Bryant's first argument.

Bryant next argues that Plaintiff cannot show that his actions were a proximate cause of Leonard's death. Bryant asserts that Brown arrived at the scene more than fifteen minutes after the accident, which exceeds her own expert's estimate of how long Leonard could survive with his external injuries. Bryant also argues that eyewitnesses will testify that Leonard died before Brown arrived.

Although a close call, the Court finds that Plaintiff has identified enough evidence to raise a dispute of fact. Defendant's conclusion that Brown arrived more than fifteen minutes after the accident relies upon the Mason County's CAD report. As illustrated above, Plaintiff has cast doubt on the reliability of this evidence. Mason County's CAD report is contradicted by the Gallia County's CAD report, which suggests that the firetruck arrived some time before 13:11. A reasonable jury could find Gallia County's CAD report and the employee's testimony that the ambulance arrived after the firetruck more credible. Based on this finding, a reasonable jury could conclude that Brown was on the scene within the fifteen minute window set by her expert.

Plaintiff has also cast doubt on Defendants' claim that eyewitnesses saw Leonard pass away before Brown's arrival. As Plaintiff's expert, Daniel O'Leary, M.D., explains, "[s]everely

injured patients can appear dead without being dead." O'Leary Report, ECF No. 164-4. And in this case, O'Leary posits that Leonard could have been alive because EMTs determined that he had a capillary refill of less than 2 seconds. O'Leary states that this is "incompatible with death." *Id*. O'Leary further rebuts Blake's assessment of Leonard's pulse. According to O'Leary, checking a bleeding patient's wrist is not an accurate way to check for a pulse because "once the blood pressure drops below 80, the radial pulse is no longer detectable." O'Leary Dep. 67:4-5, ECF No. 164-5. Given this testimony, as well as the fact Brown, Blake, Bryant, and other first responders arrived at the scene within minutes of one another, the Court cannot conclude that Brown unquestionably arrived after Leonard's death. That question must be resolved by the jury.

> b. Mason County Commission

Plaintiff's Amended Complaint alleges two due process claims against Mason County. First, Plaintiff alleges that Bryant acted pursuant to a municipal policy or custom. The Court dismissed that claim on the ground that Plaintiff failed to plead any facts that Mason County adopted an unconstitutional policy or custom. The Court also denied Plaintiff's untimely motion to file a second amended complaint, which sought to revive this claim. Second, Plaintiff alleges that Mason County had a policy to perform for-profit nonemergency transports at the expense of emergency callers. Plaintiff has since abandoned that claim. Accordingly, the Court grants summary judgment to Mason County.

(3) Count II: Negligent Hiring, Training, Retention, and Supervision

Plaintiff claims that Mason County acted negligently in hiring, retaining, and supervising Bryant. Although the Court previously dismissed this claim's federal counterpart, Plaintiff may advance this theory under state law. As the Court noted in its December 5, 2019, Memorandum Opinion, statutory immunity does not shield Mason County from negligent hiring, training,

supervision, and retention claim because West Virginia's municipal liability statute "simply does not contemplate immunity where a plaintiff sues based on negligent hiring and supervision of an employee." *Woods v. Town of Danville, W.V.*, 712 F. Supp. 2d 502, 514 (S.D. W. Va. 2010).

In determining whether Plaintiff has sufficient evidence to prove that Mason County negligently hired and retained Adam Bryant, the Court must consider whether it should "have reasonably foreseen the risk caused by hiring or retaining an unfit person[.]" *Mason Countyormick v. W. Va. Dep't of Public Safety*, 503 S.E.2d 502, 506 (1998) (per curiam). To answer this question, courts consider "the nature of the employee's job assignment, duties, and responsibilities—with the employer's duty with respect to hiring or retaining an employee increasing, as the risks to third persons associated with a particular job increase." *Id.* at 507. Courts follow a similar analysis with respect to claims for negligent supervision. *See Woods*, 712 F. Supp. 2d at 514–15 ("Under West Virginia law, negligent supervision claims must rest upon a showing that [an employer] failed to properly supervise [an employee] and, as a result, [that employee] proximately caused injury to the plaintiffs."). At bottom, "the focus is on whether the employer should have reasonably foreseen the risk" caused by the negligent hiring, retention, or supervision of an employee. *Mason Countyormick*, 503 S.E.2d at 506 n.5.

Plaintiff argues that Mason County was aware of the risk of hiring, retraining, and failing to supervise Bryant based on three key pieces of evidence. First, Plaintiff asserts that Mason County knew that Bryant had been discharged from the West Virginia State Police Academy for cheating on a test. Second, Plaintiff points to testimony from Corporal J.A. Ferrell that Bryant exercised law enforcement authority at emergency scenes while he was employed as a process server, including responding to calls. Ferrell stated that he complained about it to the department but that he was told that Bryant was allowed to go to scenes. And third, Plaintiff claims that

Ferrell heard Bryant say that he flashed his badge and threatened to arrest another woman while he was a process server.[2]

At the outset, the Court concludes that Plaintiff cannot maintain the negligent hiring claim because it is premised on cheating allegations fifteen years before Mason County hired Bryant as a process server. Put simply, even if the Court assumes that Bryant cheated at the police academy, that would not have put Mason County on notice that he was unfit to serve as a process server fifteen years later. Accordingly, the Court grants Mason County's motion as to negligent hiring.

The remaining claims, however, must be resolved by a jury. Mason County challenges the sufficiency of the evidence offered by Plaintiff, arguing that Bryant did not threaten to arrest her, that there is no evidence confirming that he threatened to arrest anyone else before December 7, 2016, and that Bryant did not exceed his authority as a volunteer fireman. These arguments miss the mark because Plaintiff's claim is not solely premised on Bryant's alleged threat. Rather, Plaintiff's claim is premised on Bryant's restraint of Brown. According to Brown, Bryant used his hands and arms to physically stop Brown from going down the hill. Although Brown stated that she did not hear Bryant threaten to arrest her, Isaiah Burgess testified that he clearly heard Bryant threaten Brown. A reasonable jury could conclude that Mason County

---

[2] Plaintiff cites "Ex. 17, pp. 12-14" in support of this claim. However, Exhibit 17 to Plaintiff's Response in Opposition to Bryant's Motion for Summary Judgment (ECF No. 164-17) is a protocol policy titled "Death in the Field" from the West Virginia Department of Health and Human Services. The Court located Ferrell's deposition as Exhibit 15 to Plaintiff's response, but none of the excerpts include a statement that Bryant told Ferrell that he flashed his badge and threatened to arrest another woman. The Court then reviewed pages 12-14 of Bryant's deposition transcript to no avail. The Court declined to sift through the rest of Plaintiff's exhibits, which are unjustifiably unnavigable and incomplete. Nevertheless, Defendant's reply does not challenge this specific representation, so the Court attributes the statement to Ferrell for the purposes of summary judgment.

negligently retained and supervised Bryant by allowing him to respond to emergency scenes without formal law enforcement training, and that this negligence injured Brown when Bryant prevented her from rendering aid to her son.

(4) Count III: Negligent Infliction of Emotional Distress

Plaintiff's third claim for relief against Bryant and Mason County is negligent infliction of emotional distress. To succeed on a claim for negligent infliction of emotional distress under West Virginia law, a plaintiff must establish four elements: (1) "that a close marital or familial relationship exist[s] between the plaintiff and the victim"; (2) "that a plaintiff . . . is present at the scene of the injury-producing event at the time it occurs and is aware that it is causing injury to the victim"; (3) "that the emotional trauma alleged by a plaintiff must be the direct result of either the critical injury to or death of a person closely related to the plaintiff"; and (4) that the emotional distress "reasonably could have been expected to befall the ordinarily reasonable person[.]" *Heldreth v. Marrs*, 425 S.E.2d 157, 163-68 (W. Va. 1992).

Plaintiff proffers evidence that Adam Bryant and other Mason County officers prevented her from rendering aid to her son, that Brown knew that her son was injured and that the first responders were not performing emergency care, and that it was foreseeable that this would cause her emotional distress. Defendants again argue that plaintiff cannot show that she was not at the scene before Leonard died. As addressed above, however, this fact is disputed. Defendants' motions for summary judgment are consequently denied.

(5) Count IV: Intentional Infliction of Emotional Distress

Plaintiff's final claim alleges intentional infliction of emotional distress. She claims that "Bryant knew of [Plaintiff's] qualifications as a Certified Flight Mobile Critical Care Nurse," but

"[d]espite his knowledge, he physically restrained [Plaintiff] and kept her from going to her son and providing medical assistance to him." Am. Compl., at ¶¶ 53-54.

To state a claim for IIED under West Virginia law, a plaintiff must establish

(1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998) (quoting *Hines v. Hills Dept. Stores, Inc.*, 454 S.E.2d 385, 392 (W. Va. 1994) (Cleckley, J., concurring)). "Whether the alleged conduct may be reasonably considered outrageous is a threshold question for the court; whether the conduct is in fact outrageous is a question for the jury." *Radford v. Hammons*, No. 2:14-24854, 2015 WL 738062, at *5 (S.D.W. Va. Feb. 20, 2015) (quoting *Gilco v. Logan Cnty. Commission*, No. 11-32, 2012 WL 3580056, at *5 (S.D. W. Va. Aug. 17, 2012)) (internal quotations omitted). Although "[c]ourts have struggled to determine whether conduct may reasonably be considered outrageous," *Lambert v. Hall*, No. 5:17-cv-01189, 2017 WL 2873050, at *4 (S.D. W. Va. July 5, 2017), "conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct," *Courtney v. Courtney*, 413 S.E.2d 418, 423–24 (W. Va. 1991).

The Court held in its prior opinion that a jury could very well determine that physically restraining a mother attempting to use her training as a critical care nurse to provide medical assistance to her son is outrageous as a matter of law. Although Plaintiff has produced evidence that Bryant physically restrained her despite his knowledge that she was a qualified medical professional, the Court cannot conclude that his actions were outrageous and intolerable. This

Court must consider that this was an active emergency scene with several safety hazards and many first responders and bystanders present. In the midst of this scene, Bryant believed that he was protecting Brown, who was pregnant at the time, by preventing her from traversing the steep embankment. There is also evidence that Bryant was concerned about the downed power lines.[3] A reasonable jury could also presume that Bryant was aware that there were other first responders on the scene who could tend to Leonard. At most, Bryant's restraint of Brown—who, although pregnant, was still working under challenging conditions as a flight nurse and fully capable of rendering aid—was negligent. Accordingly, the Court dismisses this claim.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS, in part, and DENIES, in part**, Defendants' motions for summary judgment (ECF No. 151, 153). The following claims are dismissed:

> Count I: Due Process Violation against Mason County Commission;
>
> Count II: Negligent Hiring; and
>
> Count IV: Intentional Infliction of Emotional Distress.

The following claims remain:

> Count I: Due Process Violation against Adam Bryant;
>
> Count II: Negligent Retention and Supervision; and
>
> Count III: Negligent Infliction of Emotional Distress.

---

[3] On July 22, 2021, Defendants filed a motion for leave to supplement the record, which the Court granted. Defendants' supplemental evidence included testimony from Chanse Baird, who stated that Bryant was "cussing at [Brown] and cussing at all of us and just, you know, stay away from the power lines, stay away from them." Baird Dep. 17:24-18:3. As indicated above, this evidence supports Bryant's arguments that he was not acting recklessly or intentionally to hurt Brown.

The Court **DIRECTS** the clerk to send a copy of this Order to counsel of record and any

unrepresented parties.

ENTER:        July 22, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE